# THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

OLD SCHOOL SALES, LLC, d/b/a
OLD SCHOOL VAPOR, and
SAK WHOLESALE, LLC,

     Plaintiffs,

v.

BRENT COOPER, in his official capacity
as District Attorney General of the 22nd
Judicial District of Tennessee, and his
individual capacity, DON BRITE,
in his official capacity as Chief of Police
of the Spring Hill Police Department,
and his individual capacity, ANDREW
BURDETT, in his official capacity as
Sergeant of the Spring Hill Police
Department, and his individual capacity,
the CITY OF SPRING HILL, and JOHN
DOES 1-10,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Come now the Plaintiffs, OLD SCHOOL SALES, LLC, d/b/a OLD SCHOOL VAPOR, and SAK WHOLESALE, LLC, and for their Complaint would show as follows:

## INTRODUCTION

1.　　Hemp is legal in Tennessee. But the Defendants in this case chose to ignore the law and illegally seize more than $1.35 million of hemp based on their misguided (and unreasonably wrong) belief that it was "the same damn thing" as marijuana. It is not, and the Defendants' defiance of the law violated the Plaintiffs' rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.

1

2. Plaintiffs Old School Vapor and SAK Wholesale are Tennessee-owned business that sell hemp at retail locations and as a distributor, respectively. Their operations comply with all Tennessee laws and regulations related to hemp. But, on May 9, 2024, the Defendants and other law enforcement officers seized their entire inventory of hemp flower without probable cause. Nor was there a search warrant that authorized the seizure of hemp *or* marijuana. But the Defendants took hundreds of pounds of hemp anyway.

3. The Defendants did not seize the hemp pursuant to any claim of civil asset forfeiture, nor as part of a criminal forfeiture proceeding. Rather, they generically claimed that the hemp was "evidence" of a crime. But none of the Plaintiffs nor anyone associated with them was charged with any criminal offense—because, again, the possession and sale of hemp is legal under Tennessee and federal law.

4. Left without any procedures under Tennessee law to seek the illegally seized hemp, Plaintiffs asked Defendant Cooper to order its return. But he refused to do so. And, because Defendants likely failed to store the hemp in an appropriate manner, each day that goes by increases the likelihood that the hemp will be ruined and unavailable for future retail sale. In other words, if the hemp is not returned immediately, it is likely that the entire million-dollar-plus quantity of inventory will be ruined.

5. At the same time as they were communicating with Defendant Cooper, Plaintiffs learned from other sources that he did not know basic information about how to test suspected marijuana, nor was he aware of provisions in Tennessee law

making explicit that hemp containing cannabinoids such as THCa was legal. And, although he asserted that there was a basis for the seizure of the hemp, he has never told the Plaintiffs or their counsel what that might be.

6.       As a result, Plaintiffs bring suit to seek the return of their property, to compensate them for any damage to that property, and to their other rights and interests, and to ensure that the Defendants do not continue to violate their constitutional rights in the future.

<u>PARTIES</u>

7.       Plaintiff OLD SCHOOL SALES, LLC, d/b/a OLD SCHOOL VAPOR is a Tennessee limited liability corporation with its principal place of business in Columbia, Tennessee. During all times relevant to the Complaint, it owned and operated five retail stores in Columbia, Franklin, and Spring Hill, Tennessee, all of which did business using the trade name "Old School Vapor."

8.       Plaintiff SAK WHOLESALE, LLC is a Tennessee limited liability corporation with its principal place of business in Columbia, Tennessee. During all times relevant to the complaint, it owned and operated a wholesale hemp distribution business in Columbia, Tennessee.

9.       Defendant BRENT COOPER is the elected District Attorney General for the 22nd Judicial District of Tennessee, which covers Giles, Lawrence, Maury, and Wayne counties in Tennessee. He may be served with process at the office of the District Attorney, 8 Public Square, Columbia, Tennessee 38401. He is sued in both his official and individual capacities.

10. Defendant DON BRITE is the Chief of Police of the Spring Hill Police Department. In this role, he is the highest-ranking law enforcement officer for the City of Spring Hill, Tennessee. He may be served with process at the Spring Hill Police Department Headquarters, 3636A Royal Park Boulevard, Spring Hill, Tennessee 37174. He is sued in both his official and individual capacities.

11. Defendant ANDREW BURDETT a/k/a ANDY BURDETT is a Sergeant with the Spring Hill Police Department. Upon information and belief, he supervised the other officers who conducted the illegal seizure of hemp from the Plaintiffs. He may be served with process at the Spring Hill Police Department Headquarters, 3636A Royal Park Boulevard, Spring Hill, Tennessee 37174. He is sued in both his official and individual capacities.

12. Defendant the CITY OF SPRING HILL is a municipality incorporated under Tennessee state law. It may be served with process at City Hall at 199 Town Center Parkway, Spring Hill, Tennessee 37174.

13. Upon information and belief, Defendants JOHN DOES 1 through 10, are (i) Assistant District Attorneys for the 22nd Judicial District of Tennessee, (ii) police officers with the Spring Hill Police Department, including its Drug Unit, (iii) police officers with the Columbia Police Department, including its Drug Unit, (iv) agents with the Tennessee Department of Safety & Homeland Security, and (v) deputies from the Maury County Sheriff's Department, all of whom were present when Plaintiffs' property was illegally seized, and who participated in the seizure, but whose specific identifies are unknown.

4

14.    This action arises under the U.S. Constitution and under the laws of the United States, particularly the provisions of the Fourth and Fourteenth Amendments and the Civil Rights Act, codified at 42 U.S.C. § 1983 *et seq*.

15.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1343.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### Relevant Background on Hemp and Hemp Law

A.    The Federal Government Legalized Hemp.

17.    In December 2018, Congress passed and the President signed the Agriculture Improvement Act of 2018, otherwise known as the "Farm Bill," codified in part at 7 U.S.C. § 1639*o*(1) ("2018 Farm Bill").

18.    The 2018 Farm Bill was significant for its removal of industrial hemp and hemp-derived products from Schedule I of the Controlled Substances Act, making "hemp" an ordinary (and legal) agricultural commodity. *See AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 690 (9th Cir. 2022).

19.    The legislation immediately opened opportunities for hemp derivative products to be manufactured, distributed, and sold throughout the country without restriction. Over the past five years, this market has flourished, generating an estimated $2.8 *billion* in revenue in 2023. *See* BRIGHTFIELD GROUP; DELTA-8 &

EMERGING CANNABINOID MARKET SIZING; 2023, *available at* https://pxl.to/9zaybq (last accessed May 19, 2024).

20.     Hemp is a versatile plant that belongs to the *Cannabis sativa* species. Depending on the variety, hemp generally contains trace amounts of delta-9-tetrahydrocannabinol ("Delta-9 THC"), which is one of the psychoactive compounds found in cannabis.

21.     Delta-9 THC is a cannabinoid, which is a class of organic compounds contained within the cannabis plant, each exerting distinct effects.

22.     Researchers have identified over 100 distinct cannabinoids. *See, e.g.*, Aizpurua-Olaizola, et al., *Evolution of the Cannabinoid and Terpene Content during the Growth of Cannabis sativa Plants from Different Chemotypes*, 79 J. NAT. PROD. 324−331 (2016). These cannabinoids include multiple types of THC, such as Delta-8 tetrahydrocannabinol ("Delta-8 THC"), Delta-10 tetrahydrocannabinol ("Delta-10 THC"), Hexahydrocannabinol ("HHC"), Tetrahydrocannabiphorol ("THCp"), Tetrahydrocannabivarin ("THCv"), and Tetrahydrocannabinolic acid ("THCa").

23.     Other cannabinoids found in hemp include Cannabichromene ("CBC/CBCa/CBCv"); Cannabicitran ("CBT/CBTa"), Cannabicyclol ("CBL/CBLa"), Cannabidiol ("CBD/CBDa/CBDv/CBDp"), Cannabielsoin ("CBE/CBEa"), Cannabigerol ("CBG/CBGa/CBGv/CBGm"), Cannabinol ("CBN/CBNa"), and Cannabivarin ("CBV/CBVa").

24.     As defined by the 2018 Farm Bill, the term "hemp" means "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all

derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639*o*(1).

25. "Importantly, the only statutory metric for distinguishing controlled marijuana from legal hemp is the delta-9 THC concentration level." *AK Futures LLC*, 35 F.4th at 690. In other words, "the [2018 Farm Bill's] definition of hemp encompasses [Delta-8 THC and other cannabinoid] products so long as they contain no more than 0.3 percent delta-9 THC." *Id.*

26. "[A] substance must be a derivative, extract, cannabinoid, or one of the other enumerated terms to fall within the [2018 Farm Bill's] statutory definition [of hemp]. However, these terms do not impose meaningful constraints" and the definition itself "capture[s] a wide variety of potential substances and products" derived from the hemp plant. *Id.* at 691.

B. <u>Tennessee Legalized Hemp</u>.

27. After the 2018 Farm Bill passed, the State of Tennessee changed its laws to align with the new federal hemp laws.

28. Specifically, in 2020, the Tennessee General Assembly passed, and the Governor signed, SB 357, which became Tenn. Code Ann. § 43-27-101 *et seq*. The new law defined "hemp" in the same exact manner as Congress had in the 2018 Farm Bill. *See* Tenn. Code Ann. § 43-27-207(3); *cf.* 7 U.S.C. § 1639*o*(1).

29. And the new state law similarly excluded "hemp" from Tennessee's schedule of controlled substances. Tenn. Code Ann. § 39-17-402(16)(C).

30. After the changes, Tennessee law shared the same sole factor for distinguishing cannabis as either legal hemp or illegal marijuana: the amount of Delta-9 THC a plant or product contained. Tenn. Code Ann. § 43-27-202(2)(A)(ii). Once again, as in federal law, the line was drawn at a concentration of 0.3%.

31. In other words, a plant or product that contains Delta-9 THC in a concentration of 0.3% or less on a dry weight basis is legal "hemp," while a product that contains Delta-9 THC in a higher concentration is instead considered by law to be the controlled substance "marijuana."

32. From 2020 to 2022, there were no other regulations or restrictions placed on the sale or distribution of hemp or hemp-derived products in Tennessee.

33. But, in 2023, Tennessee established the first comprehensive set of laws and regulations in the United States aimed at "regulat[ing] the sale and distribution of products containing hemp-derived cannabinoids." Tenn. Code Ann. § 43-27-201.

34. The law, introduced as SB 378, defined a new category of products distinct from the hemp plant called "Hemp-derived cannabinoid[s]." Tenn. Code Ann. § 43-27-202(2).

35. Also known as "HDC products," the new law defined them as "[a] hemp-derived product containing delta-9 [THC] in a concentration of three-tenths of one percent (0.3%) or less on a dry weight basis." Tenn. Code Ann. § 43-27-202(2)(A)(ii).

36. Notably, the new law explicitly declared that legal "[h]emp-derived cannabinoid[s]" included the cannabinoids listed in paragraph 22 above, such as THCa and Delta-8 THC. Tenn. Code Ann. § 43-27-202(2)(B)(i)-(vi).

37. The new law did not place any limit on the concentration of these cannabinoids in any given hemp plant or product. Again, as with federal law, the only distinction between legal "[h]emp-derived cannabinoid[s]" and illegal marijuana under Tennessee law was the threshold of Delta-9 THC, which remained drawn at 0.3%. Tenn. Code Ann. § 43-27-202(2)(A)(ii).

38. Although Tennessee lawmakers did not change the legality of such products, they did place extensive restrictions on their manufacture and sale. For example, SB 378 prohibited the sale of HDC products to anyone under the age of 21, promulgated retail display requirements, crafted licensing requirements for manufacturers and retailers, set packaging requirements, mandated warning labels, and established testing criteria, among other things. *See* Tenn. Code Ann. §§ 43-27-203 to 211.

39. Some of these regulations took effect in July 2023, while others will go into effect in July 2024. *Compare* Tenn. Code Ann. §§ 43-27-202, 203(b)-(e), 204, 67-6-232 (took effect in July 2023), *with* Tenn. Code Ann. §§ 43-27-201, 203(a), 205-211 (taking effect in July 2024).

40. In addition to regulating the manufacture and sale of HDC products, Tennessee lawmakers chose to tax them, as well. Tenn. Code Ann. § 67-6-232. Starting in July 2023, retailers were required to remit to the state a tax of 6% of the sales price of an HDC product. *Id.*

41. Notably, in enacting this legislative scheme, Tennessee recognized that hemp was an intoxicating substance. *See, e.g.*, Tenn. Code Ann. § 43-27-210. That

is, the Tennessee General Assembly and the Governor understood that products derived from hemp could be intoxicating like marijuana. Nonetheless, the state created a robust regulatory regime for its legal distribution and sale.

C.    Hemp is a Perishable Product.

42.    As Congress recognized in the 2018 Farm Bill, hemp is an agricultural commodity. Like many other agricultural products, whether it be corn or soybeans or milk or eggs, hemp is a perishable product that will—over time—no longer be suited for the manner of use it was originally intended.

43.    Unlike milk, hemp does not spoil in the sense that it grows excessive bacteria, although (as a plant) that certainly can happen if the conditions are right. Rather, hemp spoils in the sense that naturally, over time, the amount of Delta-9 THC rises from the levels that make it permissible for legal sale and possession (no more than 0.3%) to levels that classify it as marijuana, which cannot generally be possessed or sold legally in Tennessee.

44.    As it grows, the hemp plant naturally makes the cannabinoid THCa, which is an acid precursor of the intoxicating Delta-9 THC molecule. Over time, and when subjected to certain conditions, the acid group is dropped from the THCa molecules in the hemp plant, chemically transforming the THCa to Delta-9 THC.

45.    This process is known as decarboxylation. It is an irreversible process, and (if it happens at a great enough quantity) it transforms legal hemp flower into unsellable, illegal marijuana.

46. Although decarboxylation is a natural process, it is not an inevitable one. It is promoted and accelerated by heat, time, exposure to oxygen, and exposure to UV light, including UV rays which are produced by the sun. Typically, heat is the primary accelerant for decarboxylation, as energy is required for the acid group to drop from the THCa molecule.

47. Growers, distributors, and retailers of hemp generally take precautions to prevent decarboxylation, since it can result in converting legal hemp into illegal marijuana and prevent the valuable sale of hemp meant for consumers.

48. Precautions against the risk of decarboxylation include storing hemp in opaque containers, in a cool and dry place, far away from the sun's rays. Without proper storage, hemp may "decarb" more quickly than expected.

D.    Special Tools Are Necessary to Distinguish Hemp from Marijuana.

49. Because the only distinction in Tennessee between legal hemp and illegal marijuana is the amount of Delta-9 THC in the plant or HDC product, law enforcement agencies seeking to investigate the alleged possession or distribution of marijuana must (i) know and understand the distinction between the legal (hemp) and illegal (marijuana) substances, and (ii) tailor their actions to the distinction to ensure that they do not seize legal products without a valid basis.

50. This is what well-trained officers do, and it is what the Tennessee Bureau of Investigation (TBI) regularly does.

51. Consider the Dangerous Drug Task Force (TDDTF), which is part of the TBI. It "provides equipment, training, intelligence, and investigative tools to

assist law enforcement and prosecutorial authorities in strategically identifying, targeting, and prosecuting drug offenders." *About the TDDTF*, *available at* https://www.tn.gov/tddtf/about-the-tddtf.html (last accessed May 19, 2024).

52.     Although the TDDTF previously focused its efforts on meth and opioids, it has a broad mandate and adjusts its emphasis depending on current trends. Recently, it has begun to target hemp products that exceed the legal limits for Delta-9 THC and, as such, can be considered illegal marijuana.

53.     To do so, in 2023, TDDTF purchased LightLab 3 Cannabis Analyzers from Orange Photonics. These machines are portable high performance liquid chromatograms ("HPLCs") that, according to the company, allow "non-technical users [to] analyze the potency of samples any time, any place." *LightLab 3*, Orange Photonics, *available at* https://orangephotonics.com/lightlab-3/ (last accessed May 19, 2024).

54.     One version of the LightLab "measures up to 19 cannabinoids for most product types excluding edibles" while another more sensitive version provides "ultra-low detection limits down to 1.7ppm," and includes the detection of cannabinoids in edibles. The high sensitivity version provides potency measurements for numerous cannabinoids, including Delta-9 THC and THCa. *Id.*

55.     For approximately the past year, the TDDTF has worked with local law enforcement agencies, including sheriffs' departments and regional drug task forces, to conduct enforcement activity at smoke shops and other retail locations that sell hemp flower and products containing HDCs.

12

56.     The Special Agent in Charge of the TDDTF, Tommy Farmer, has said publicly that "[t]here's no way under a trained eye or even a trained microscope that you can tell the difference between [hemp and] high grade marijuana." Shannon Smith, *New TBI Testing Can Tell the Difference Between Marijuana and Hemp*, WBIR News, Oct. 30, 2019, *available at* https://pxl.to/v9d2it1 (last accessed May 19, 2024).

57.     For this reason, when TDDTF conducts enforcement activity related to suspected marijuana, its agents use the LightLab 3 HPLC to test the potency of hemp products to determine if they contain 0.3% or less of Delta-9 THC. For the reasons described above, the sort of potency measurement the LightLab provides is necessary to distinguish between legal hemp and illegal marijuana.

58.     There are no commercially available field tests or other means to distinguish between legal hemp and illegal marijuana other than the LightLab 3 and similar portable HPLCs.

59.     On the contrary, many so-called "field" tests previously used by law enforcement agencies before the passage of the 2018 Farm Bill are useless for distinguishing between legal hemp and illegal marijuana.

60.     For example, a company called DetectaChem manufactures and distributes test kits it markets to law enforcement to determine in the field whether a substance contains a controlled substance.

61.     One of its products, the MobileDetect, offers what purports to be a "CBD / THC Test Pouch." According to the company's website, this product "detects

and differentiates between THC and CBD in marijuana, hemp products, CBD products, hash oil, edibles, vape pens and more. It also provides presumptive determination of whether the THC content is above or below the 0.3% threshold."

62. But MobileDetect (and any other DetectaChem product) cannot distinguish between different types of THC. That is, such tests cannot tell the difference between Delta-9 THC and Delta-8 THC (or any other cannabinoids containing THC).

63. Because Delta-8 THC, Delta-10 THC, and HHC cannabinoids are all legal in Tennessee in any concentration, a test that merely shows that there is more than 0.3% THC in a product cannot distinguish between a legal product (hemp containing those cannabinoids in any quantity) and an illegal one (marijuana with Delta-9 THC over the legal limit).

64. No reasonable law enforcement officer would rely on such tests to establish probable cause to believe that purported hemp was in fact marijuana. *See, e.g.*, *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 696 (6th Cir. 2020) ("It is unreasonable to submit an innocuous product to a lab test that is incapable of determining its legality, then rely on that inconclusive evidence to say that the substance was probably illegal.")

## Relevant Background on Plaintiffs
## and the Unlawful Seizure of Their Property

A.    <u>The Plaintiffs Sell Hemp, Not Marijuana</u>.

65.    Old School Vapor is a family-owned smoke shop with five locations in Columbia, Franklin, and Spring Hill, Tennessee that sells hemp, tobacco, and vape products. The first of the five locations opened in 2014. The company was founded to provide customers with alternatives to cigarette smoking.

66.    SAK Wholesale is a family-owned wholesale business with one location in Columbia, Tennessee. It opened in January 2024 and was founded to sell high-quality hemp, tobacco, and vape products at reasonable wholesale prices to retail stores.

67.    Plaintiffs comply with all state and federal regulations relating to hemp. Any person entering an Old School Vapor store must be 21 or older and possess a valid identification card.

68.    In addition, Plaintiffs have complied with SB 378 since its passage in 2023. For example, Plaintiffs have remitted tens of thousands of dollars in taxes to the Tennessee Department of Revenue resulting from the sale of HDC products.

69.    All the hemp products Plaintiffs sell are manufactured in accordance with Tennessee law. For example, each batch of hemp flower and all batches of HDC products were sent to a third-party laboratory to confirm that they contain 0.3% or less of Delta-9 THC.

70.    Laboratory results showing that the Plaintiffs' entire hemp inventory was compliant with Tennessee law were always publicly available, and Plaintiffs

maintained copies of the results on their premises when the Defendants conducted the illegal seizures described below.

71.    At all times relevant to the Complaint, Plaintiffs strictly maintained their hemp flower inventory in a manner designed to prevent decarboxylation.

72.    Shortly before the curing process (after harvest), and well before it was received by SAK Wholesale, the hemp flower the Plaintiffs purchased for resale was vacuum sealed in four different bags to prevent exposure to air and UV light.

73.    Once the hemp flower arrived at the SAK Wholesale warehouse, it was stored in a dark environment, free of exposure to light, where the temperature was maintained between 68- and 72-degrees Fahrenheit.

74.    Even when the hemp flower was purchased from SAK Wholesale by Old School Vapor, the vacuum seal was not broken until the hemp flower reached the retail store shelf. Based on the high sales volume at the Old School Vapor stores, this meant that the hemp flower was unsealed for at most a few days before it was sold to consumers. Even then, the hemp was not exposed to UV light prior to sale.

B.    The Defendants Illegally Seized Hemp.

75.    On May 7, 2024, Detective Thomas Goetz of the Spring Hill Police Department obtained five separate search warrants for the five retail locations operated by Plaintiff Old School Sales LLC.

76.    None of the warrants authorized the search of any location owned by or affiliated with Plaintiff SAK Wholesale LLC.

77.    Upon information and belief, the allegations that supported issuance

16

of the warrants had nothing to do with marijuana or hemp. Rather, the warrants authorized law enforcement officers to search for evidence and items completely unrelated to either hemp or marijuana.

78.    Upon information and belief, General Cooper, Chief Brite, and Sergeant Burdett each were aware of the scope of the search warrants and the fact that the warrants did not authorize the collection of any evidence related to either hemp or marijuana.

79.    Pursuant to the five warrants, on May 9, 2024, multiple law enforcement agencies conducted a coordinated search of all five Old School Vapor locations.

80.    Personnel from the Office of the District Attorney General for the 22nd Judicial District of Tennessee, the Columbia Police Department, the Spring Hill Police Department, the Tennessee Department of Safety & Homeland Security, the Maury County Sheriff's Department, and the Williamson County Sheriff's Department conducted the searches and seized property from the Plaintiffs.

81.    Upon information and belief, Sergeant Burdett and General Cooper were present at the scene of the searches, and Chief Brite supervised the Spring Hill Police Department officers who conducted it.

82.    Although Detective Goetz did not obtain a search warrant for the warehouse owned and operated by Plaintiff SAK Wholesale, the law enforcement agencies identified in paragraph 80 above made entry and searched it anyway.

83.    No employee, agent, or owner of SAK Wholesale consented to the

search of its warehouse. Nor was it reasonable for law enforcement officers to enter the SAK warehouse without consent.

84.     Although the SAK warehouse was located in the same building as one of the Old School Vapor retail locations in Columbia, Tennessee, the two businesses were separate and separated by a wall and door, which was closed at the time the officers entered. In other words, to access the SAK warehouse, officers opened a non-public door that they had no authority to open.

85.     In addition, at the time officers attempted to enter the SAK warehouse, a SAK Wholesale employee told officers that the warehouse was not part of Old School Vapor. In response, the entering officers said they were authorized to search it anyway. Those officers did not produce a warrant authorizing their entry or otherwise explain the basis for their claim of authority.

86.     A manager of both SAK Wholesale and Old School Vapor, identified herein as "S.O." was present at the SAK warehouse when officers searched it and the neighboring Old School Vapor retail location.

87.     When they first entered the Plaintiff's property, officers informed S.O. that their search was unrelated to hemp flower or HDC products.

88.     Consistent with this statement, officers did not seize any hemp flower or HDC products at the outset of their search, even though such products were easily visible on the retail counters of the Old School Vapor locations.

89.     Things changed after officers illegally entered the SAK warehouse and demanded entry into its large safes.

90.     Consistent with the description of hemp storage above, and with the purpose of preventing decarboxylation, SAK Wholesale maintained its bulk hemp flower inside large safes, which kept the inventory cool and blocked any sunlight.

91.     At the time of the illegal search of its warehouse, SAK Wholesale maintained an extremely large quantity of bulk hemp flower in its safes, collectively worth $1,182,572.

92.     SAK Wholesale can calculate the value of its hemp flower inventory nearly exactly, because it maintained invoices, logs, and other records sufficient to account for every package of hemp flower it received and intended to sell.

93.     After illegally entering the warehouse, officers saw the safes and demanded that S.O. provide them with the combination to open them.

94.     At first, S.O. refused, reminding officers that they did not have a search warrant for either the SAK warehouse or the safes within it.

95.     In response, Sergeant Burdett told S.O. that the Fire Department was on its way to the warehouse to cut the safes open. So, if S.O. refused to open the safes, Burdett said, the safes would be destroyed.

96.     Faced with this threat to SAK's property, S.O. was coerced into opening the safes for Sergeant Burdett, and he did so.

97.     As he opened the safes, S.O. told Sergeant Burdett that the safes exclusively contained legal hemp flower, which was intended for subsequent retail sale.

98.     At the same time, he told officers—including Sergeant Burdett—that

all the hemp flower in the safes complied with Tennessee law. He also told them that he had valid Certificates of Analysis ("COAs") reflecting lab test results certifying that the hemp flower contained 0.3% or less of Delta-9 THC, and that these COAs were also in the warehouse.

99. When officers saw the extremely large amount of hemp flower contained in the safes, they immediately changed the focus of their search and seizure efforts from the targets of the search warrants to the legal hemp in the safes.

100. Within a few minutes of opening the safes, and after consultation with General Cooper, Chief Brite, and Sergeant Burdett, officers began seizing the hemp from the safes and packing it into boxes to take back to the Spring Hill Police Department.

101. Upon information and belief, the decision to seize the hemp from the safes was made at the direction of General Cooper, who assured officers in the warehouse that they could do so.

102. Because S.O. did not see officers with any testing devices that could analyze the Delta-9 THC content of the hemp flower, he asked them how they had determined that the products were subject to seizure.

103. Officers responded that the hemp they seized from the safes had tested positive for THC, and they therefore presumed it to be marijuana.

104. S.O. later saw a box of MobileDetect testing devices brought by law enforcement to the premises. As detailed above, there is no device manufactured by MobileDetect that can distinguish between legal hemp and illegal marijuana.

20

105.    After S.O. attempted to explain to officers the different types of THC and the legality of hemp flower, another employee of Old School Vapor overheard a conversation between General Cooper and officers. During that conversation, Cooper stated that hemp was "the same damn thing" as marijuana.

106.    Later, officers told S.O. that, if the hemp flower passed further testing, it would be returned to him. Another officer told S.O. that he could buy more hemp flower because they were only seizing his current inventory.

107.    After General Cooper directed officers to seize the hemp flower from the SAK warehouse safes, officers at the Old School Vapor retail locations began to seize hemp flower from four of its locations, as well.

108.    But deputies with the Williamson County Sheriff's Department refused to seize any hemp flower from Old School Vapor's Franklin location. A law enforcement officer on location there explained that this was because "it," referring to hemp flower, "wasn't in the warrant."

109.    At the time of the illegal seizure of the hemp flower from the four Old School Vapor locations, the company held hemp flower for retail sale worth $168,034. All of it was illegally seized.

110.    Old School Vapor can calculate the value of its hemp flower inventory nearly exactly, because it maintained invoices, logs, and other records sufficient to account for every jar that it intended to sell.

111.    After officers seized the $1,350,607 worth of hemp from the Plaintiffs, they failed to provide Plaintiffs with any seizure paperwork or other documentation

reflecting a process for Plaintiffs to seek the return of the hemp.

112.   On the contrary, officers merely listed the hemp on an inventory sheet, which had the "evidence" box checked at the top of the document.

113.   But, notwithstanding any purported designation of the hemp as "evidence," no employee of SAK Wholesale or Old School Vapor was arrested nor cited for any violation of any law, as there was no crime that occurred or could reasonably be investigated related to the Plaintiffs' possession of legal hemp.

C.   <u>General Cooper Refused to Return the Illegally Seized Hemp.</u>

114.   There is no process afforded by Tennessee law for Plaintiffs to seek the return of the illegally seized hemp.

115.   That is, in Tennessee, there are no available procedures for an aggrieved party, placed in the same position as the Plaintiffs here, to seek the return of property seized in a manner that violates the Fourth Amendment.

116.   Although the Federal Rules provide that "[a] person aggrieved by an unlawful search and seizure of property . . . may move for the property's return," Fed. R. Crim. P. 41(g), Tennessee law provides no such mechanism. *See State v. Rowland*, 520 S.W.3d 542, 547 (Tenn. 2017) ("Rule 41(g) as written is not an open-ended vehicle for the return of seized property.")

117.   Nonetheless, Plaintiffs (through counsel) immediately sought the return of their hemp inventory.

118. On May 13, 2024, four days after the illegal search and seizure, counsel for the Plaintiffs sent a letter via electronic mail to General Cooper, requesting the return of the seized hemp products by May 15, 2024.

119. Among other things, the letter explained that (i) the hemp in the warehouse and retail stores had been illegally seized without a warrant, (ii) there was no probable cause to believe that the legal hemp was illegal marijuana, and (ii) without proper storage, the seized hemp products were at risk of decarboxylation.

120. The letter also informed Defendant Cooper of a similar case in Rutherford County where a District Attorney General was alleged to have violated store owners' rights based on a similar illegal search and seizure of hemp.

121. In that case, which involved a law enforcement operation known as "Operation Candy Crush," officers executed search warrants and arrested store owners for selling products containing cannabidiol ("CBD"), with officers alleging that CBD was the same thing as illegal marijuana. It was not.

122. The District Attorney General supervising "Operation Candy Crush" eventually dropped all charges against the store owners and settled a civil suit by the store owners pursuant to 42 U.S.C. § 1983 for $1.3 million.

123. Defendant Cooper responded to the letter via email, writing in full:

> It is my understanding that all items seized were done so pursuant to a valid search warrant and/or an exception to the search warrant requirement. All of the items will be tested by the Tennessee Bureau of Investigation crime lab or by the Tennessee Department of Agriculture. Should that testing negate the probable cause to believe the items

> are illegal, they may be returned to your client at that time. Until then, they will remain in evidence as part of a pending criminal investigation.

124. General Cooper did not explain what exception to the search warrant requirement might apply, because none did. Nor did General Cooper explain why he was authorized to seize the hemp before he or officers had obtained the necessary testing to determine whether it was a controlled substance.

### D. General Cooper's Actions Reflected Ignorance of the Law.

125. Upon information and belief, in the days after the illegal search and seizure of Plaintiff's property, General Cooper communicated, including via text message and email, with multiple individuals about the seizures of hemp.

126. In these communications, General Cooper indicated that he was unsure how to test the seized hemp to determine if it was in fact illegal marijuana.

127. In addition, Defendant Cooper indicated that he believed THCa was a controlled substance under Tennessee law, contrary to Tenn. Code Ann. § 43-27-202(2)(B)(vi).

128. Similarly, Defendant Cooper indicated that he was not familiar with high performance liquid chromatography ("HPLC"), a standard laboratory technique used to separate and analyze quantities of different types of cannabinoids, including THCa and Delta-9 THC.

129. Defendant Cooper also indicated in these communications that he was not familiar with LightLab, a testing system that is regularly used by law

24

enforcement in Tennessee that is capable of measuring the relative amounts of different cannabinoids (such as Delta-9 THC) in hemp.

130. After learning of Defendant Cooper's ignorance of the law, counsel for Plaintiffs sent a renewed request that he direct the immediate return of the illegally seized hemp.

131. Defendant Cooper indicated in response:

> Due to our conversations, we have expedited the testing of the cannabis items. However, I haven't received the results as of this moment. I will let you know when I get the results and whether or not we will be returning any items at that time.

132. Once again, in this communication, General Cooper did not indicate why he believed he was authorized to continue to seize Plaintiff's property without any indication that it was contraband.

133. No criminal charges have been brought against Plaintiffs or any of their owners, officers, agents, or employees.

134. Plaintiffs continue to be deprived of the hemp products illegally seized by the Defendants.

135. In addition, upon information and belief, the Spring Hill Police Department is maintaining the seized hemp in a manner that is likely to result in decarboxylation. For example, the hemp is not being stored away from light sources or in a climate-controlled environment.

136. Notwithstanding the lack of charges, and the lack of any probable cause to believe that Plaintiffs violated the law, the Spring Hill Police Department

publicized the searches on its social media pages, including Facebook, falsely suggesting that Plaintiffs had committed a crime.

137.    These false and defamatory statements have caused irreparable harm to the Plaintiffs' business reputation, resulted in a loss of sales, and caused at least two of the Plaintiffs' employees to quit.

138.    As a result of the illegal actions taken by Defendants, Plaintiffs suffered severe mental and emotional distress, loss of business income and enjoyment of life, and expenses associated with rebuilding their businesses.

## STATEMENT OF THE CLAIMS

### COUNT I

**VIOLATION OF FOURTH AMENDMENT RIGHTS**
**TO BE FREE FROM UNLAWFUL SEARCH AND SEIZURE**
*as to Defendants Cooper, Brite, Burdett, and Does*
*in both their official and individual capacities*
(42 U.S.C. § 1983)

139.    Plaintiffs incorporate by reference all allegations contained in the paragraphs above as if restated fully herein verbatim.

140.    Defendant Cooper undertook investigatory functions usually conducted by police, so he is not immune from suit solely because of his elected position as District Attorney General.

141.    Upon information and belief, and while acting under color of law, Defendant Cooper pushed law enforcement officers to unreasonably search Plaintiff SAK Wholesale's warehouse without a search warrant.

142.    Acting under color of law, the Defendants named in this Count knowingly and intentionally unlawfully searched and seized property from SAK Wholesale without a search warrant.

143.    Defendants knew that SAK Wholesale was a separate business entity and premises from Old School Vapor, and thus a search of the warehouse would require a separate search warrant. But they authorized, directed, and conducted the illegal search anyway.

144.    The warrantless search of the SAK Wholesale warehouse, and the seizure of property from within it, was unreasonable.

145.    These actions violated Plaintiff SAK Wholesale's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

COUNT II

**VIOLATION OF FOURTH AMENDMENT RIGHT
TO BE FREE FROM UNLAWFUL SEIZURE**
*as to Defendants Cooper, Brite, Burdett, and Does
in both their official and individual capacities*
(42 U.S.C. § 1983)

146.    Plaintiffs incorporate by reference all allegations contained in the paragraphs above as if restated fully herein verbatim.

147.    Defendant Cooper undertook investigatory functions usually conducted by police, so he is not immune from suit solely because of his elected position as District Attorney General.

148.    Acting under color of law, Defendant Cooper pushed law enforcement officers to unreasonably seize legal hemp from the Plaintiffs without probable cause,

notwithstanding the abundance of evidence that the hemp in Plaintiffs' possession was legal under Tennessee and federal law.

149.   Acting under color of law, Defendants Brite, Burdette, and Does 1 to 10 participated in, supervised other officers who undertook, and directed officers to participate in the unreasonable seizure of legal hemp from the Plaintiffs without probable cause.

150.   The Defendants named in this Count were aware of the serious risk that they were seizing property that was not illegal, and they consciously and recklessly disregarded that risk.

151.   These actions violated Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution.

COUNT III

**VIOLATION OF FOURTEENTH AMENDMENT RIGHT
TO DUE PROCESS**
*as to all Defendants
in their official capacities*
(42 U.S.C. § 1983)

152.   Plaintiffs incorporate by reference all allegations contained in the paragraphs above as if restated fully herein verbatim.

153.   Defendant Cooper undertook investigatory functions usually conducted by police, so he is not immune from suit solely because of his elected position as District Attorney General.

154.   Acting under color of law, the Defendants refused to return property that was illegally seized from Plaintiffs.

155. Acting under color of law, Defendants unlawfully seized property from Plaintiffs without any procedure for Plaintiffs to obtain return of their property.

156. These actions violate Plaintiffs' right to due process under the Fourteenth Amendment to the United States Constitution.

COUNT IV

**VIOLATION OF FOURTH AMENDMENT RIGHTS**
**TO BE FREE FROM UNLAWFUL SEIZURE**
*as to the City of Spring Hill*
(42 U.S.C. § 1983)

157. Plaintiffs incorporate by reference all allegations contained in the paragraphs above as if restated fully herein verbatim.

158. The City of Spring Hill had a duty to properly train and supervise its police officers, specifically those working within the Spring Hill Police Department, but it failed to do so.

159. This duty to train and supervise included ensuring that its police officers were aware of the current provisions of Tennessee law, including the laws related to hemp and controlled substances, that they were tasked with enforcing.

160. The failure to train officers about the distinction between hemp and marijuana and the failure to supervise officers who conduct investigations into alleged possession of marijuana amounted to a policy of inaction.

161. This policy of inaction led to the violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution.

162.    As a result of the Defendants' conduct, Plaintiffs have suffered:

a.    Loss of property in an amount of more than $1,350,607;

b.    Severe mental and emotional distress;

c.    Loss of business income;

d.    Loss of enjoyment of life;

e.    Diminished reputation and standing in the community;

f.    Out-of-pocket expenses associated with rebuilding their businesses.

WHEREFORE, each named Plaintiff respectfully requests:

a.    That a jury of 12 persons be empaneled to try this case;

b.    An award of compensatory damages in an amount to be determined at trial but not less than $1,350,607;

c.    An award of punitive damages against Defendants Cooper, Brite, Burdett, and the Does;

d.    An award of pre-judgment and post-judgment interest;

e.    A declaratory judgment determining that Defendants violated the Plaintiffs' constitutional rights;

f.    Injunctive relief in the form of an order compelling Defendants Brite and the City of Spring Hill to return the illegally seized hemp;

g.    In the alternative as to sub-paragraph (f), injunctive relief in the form of an order compelling Defendants Brite and the City of Spring Hill to maintain the

illegally seized hemp in a manner designed to prevent decarboxylation, specifically by keeping it in a climate-controlled room with a temperature of less than 68-degrees Fahrenheit, and in a manner where it will not be subjected to heat, artificial light, or sunlight.

h. Injunctive relief in the form of an order compelling Defendants Cooper, Brite, and the City of Spring Hill to appoint an attorney and/or expert with a detailed knowledge of hemp law, constitutional law, and criminal procedure to teach employees of the Office of the District Attorney for the 22nd Judicial District of Tennessee and the Spring Hill Police Department about (i) the differences between hemp and marijuana, (ii) the recent developments in state law on this issue, and (iii) how these differences impact citizens' rights under the U.S. and Tennessee Constitutions;

i. An award of reasonable costs to the appointed attorney or expert for the preparation of, and teaching, of the classes identified in paragraph (h);

j. Reasonable attorney's fees, expert fees, and all costs of litigation incurred by Plaintiffs pursuant to 42 U.S.C. § 1988;

k. Such other and general relief as the Court deems just and equitable.

Dated: May 20, 2024            Respectfully submitted,

*/s/ Alex Little*
J. Alex Little (TN BPR #29858)
Zachary C. Lawson (TN BPR #36092)
John R. Glover (TN BPR #37772)
Litson PLLC
6339 Charlotte Pike, Unit C321
Nashville, TN 37209
Telephone: 615-985-8205
alex@litson.co
zack@litson.co
jr@litson.co
*Attorneys for Plaintiffs*